## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
378 N. Main Avenue
Tucson, AZ 85701,

        Plaintiff,

  v.

NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION,
1401 Constitution Ave NW,
Washington, DC 20230,

 and

DEPARTMENT OF COMMERCE,
1401 Constitution Ave., N.W.,
Washington, DC 20230,

        Defendants.

**COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF**

Case No.: _____

## INTRODUCTION

1.    This case challenges the Department of Commerce and National Oceanic and Atmospheric Administration's ("NOAA") refusal to release any records that would shed light on the recent and sudden termination of the "Advisory Committee for the Sustained National Climate Assessment" ("NCA Committee"). Although the NCA Committee was in the middle of work critical to preparing the Fourth National Climate Assessment, required to be released next year pursuant to the Global Change Research Act, 15 U.S.C. § 2936, the NCA Committee was disbanded without any indication as to how its outstanding work will now be completed.

2.    Seeking to understand the bases for terminating the NCA Committee, on August 31, 2017, the Center for Biological Diversity ("Center") submitted a request under the Freedom of Information Act, 5 U.S.C. § 552, *as amended* ("FOIA"), seeking the records that would

explain the decision to disband the NCA Committee, including records identifying who

participated, what factors were considered, and how the NCA Committee's unfinished work will

now be completed. A true and correct copy of the FOIA request is attached.

3.      Although more than 20-working days have passed, to date Defendants have

neither responded to the request nor provided any responsive records. Accordingly, the Center

brings this suit pursuant to FOIA over Defendants' failure to respond, seeking declaratory and

injunctive relief to require the search for, and production of, all responsive records.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this matter pursuant to 5 U.S.C. § 552(a)(4)(B)

and 28 U.S.C. § 1331 because this action arises under FOIA, and the Declaratory Judgment Act,

28 U.S.C. §§ 2201-2202.

5.      Venue properly vests in this Court pursuant to 5 U.S.C. § 552(a)(4)(B), which

provides venue for FOIA cases in this district, and because the responsive records may be found

in this district.

6.      Declaratory relief is appropriate under 28 U.S.C. § 2201.

7.      Injunctive relief is appropriate under 28 U.S.C. § 2202 and 5 U.S.C. §

552(a)(4)(B).

## PARTIES

8.      Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a national, non-profit

conservation organization with offices throughout the United States.  The Center has more than

1.5 million members and online activists who care about protecting the natural environment from

the ravages of climate change and other environmental degradation. The Center and its members

are harmed by Defendants' violations of FOIA, which are preventing the Center from gaining a full understanding of Defendants' activities, priorities, and decision-making.

9.      Defendant DEPARTMENT OF COMMERCE is a cabinet-level federal agency responsible for overseeing the activities of NOAA, and subject to FOIA pursuant to 5 U.S.C. § 552(f).

10.      Defendant NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION is a federal agency within the Department of Commerce. NOAA has custody and/or control of the records subject to the Center's FOIA request, and is subject to FOIA pursuant to 5 U.S.C. § 552(f).

## STATUTORY BACKGROUND

11.      FOIA's basic purpose is for government transparency. It establishes the public's right to access all federal agency records with certain narrow exceptions. 5 U.S.C. § 552(b)(1)-(9).

12.      FOIA imposes strict and rigorous deadlines on federal agencies when they receive requests for records pursuant to FOIA. Specifically, an agency must determine whether to disclose responsive records and notify the requester of its determination within 20 working days of receiving a FOIA request, and it must make releasable records "promptly" available. *Id.* §§ 552(a)(3)(A), (a)(6). Although the statute also provides limited circumstances under which this deadline may be extended, it does not provide for any extension where the agency has not responded to the requestor at all. *Id.* § 552(a)(6).

13.      FOIA requires each agency to make reasonable efforts to search for records in a manner reasonably calculated to locate all records responsive to the FOIA request. *Id.*

§ 552(a)(3)(C)-(D).  The cut-off date for the agency's search is the date that the agency conducts the search and not any earlier date.

14.     FOIA requires federal agencies to expeditiously disclose requested records, *see id.* § 552, and mandates a policy of broad disclosure of government records. Any inquiry under FOIA brings with it a strong presumption in favor of disclosure.

15.     FOIA provides that a request for records must simply be "reasonably described." *Id*. § 552(a)(3)(A)(i).  Similarly, the Department of Commerce's FOIA regulations provide that agencies within the Department will fulfill FOIA requests that "reasonably describe the agency records sought," simply stating that "the more specifically the request describes the records sought, the greater the likelihood that the Department will be able to locate those records." 15 C.F.R. § 4.4(c).

16.     FOIA provides that the U.S. district courts have jurisdiction "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).

17.     Alternatively, an agency's response to a FOIA request is subject to judicial review under the APA, which confers a right of judicial review on any person who is adversely affected by agency action, 5 U.S.C. § 702, and authorizes district courts to compel agency action that is unlawfully withheld or unreasonably delayed.  *Id.* § 706(1).  District courts must set aside any agency action that is found to be "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  *Id.* § 706(2)(A).

## FACTUAL BACKGROUND

**A.    The Global Change Research Act**

18.    Congress passed the Global Change Research Act ("GCRA"), 15 U.S.C. § 2921, *et seq.*, in 1990, based on explicit Congressional findings that "human activities, coupled with expanding world population, are contributing to processes of global change that may significantly alter the Earth habitat within a few human generations," through "significant global warming and thus alter[ing] world climate patterns and increase[d] global sea levels." 15 U.S.C. 2931(a). Recognizing that these impacts threaten "world agricultural and marine production, coastal habitability, biological diversity, human health, and global economic and social well-being," *id.,* and that in order to "abate, mitigate, and cope with global change," the Nation requires a "greatly improved scientific understanding and predication of these global changes and their effects," in the GCRA Congress created "a comprehensive and integrated United States research program [to] assist the Nation and the world to understand, assess, predict and respond to human-induced and natural processes of global change." *Id*. § 2931(b).

19.    To accomplish this goal, the GCRA created a "Committee on Earth and Environmental Sciences" (hereafter "Science Committee"), with representatives from NOAA and numerous other federal agencies, *id.* § 2932, and charged the Committee with developing a "National Global Change Research Plan," which must be updated every three years. *Id.* § 2934(a).  The Science Committee must also report "at least annually . . . on Federal global change research priorities, policies, and programs." *Id.* § 2932(e)(7).

20.    In order to provide for the scientific underpinning of the Research Plan, the GCRA further provides that, at least every four years, the Science Committee must complete a National Climate Assessment ("NCA").  15 U.S.C. § 2936. In particular, it provides:

On a periodic basis (not less frequently than every 4 years), the [Science Committee] shall prepare and submit to the President and the Congress an assessment which –

(1)     integrates, evaluates, and interprets the findings of the Program and discusses the scientific uncertainties associated with such findings;

(2)     analyzes the effects of global change on the natural environment, agriculture, energy production and use, land and water resources, transportation, human health and welfare, human social systems, and biological diversity; and

(3)     analyzes current trends in global change, both human-induced and natural, and projects major trends for the subsequent 25 to 100 years.

*Id.*

**B.      Prior National Climate Assessments**

21.     Although the GCRA requires an NCA be issued every four years, the first one was not issued until 1990, and the second in 2009, following a successful lawsuit. *See Center for Biological Diversity v. Brennan*, 571 F. Supp. 2d 1105 (N.D. Cal. 2007).

22.     In support of efforts to complete the Third NCA, the Department of Commerce established the "National Climate Assessment and Development Advisory Committee." The Committee was charged with work aimed toward completing the Third NCA.

23.     In May, 2014, the Third NCA was issued. Building on prior Assessments, among the Third NCA's many findings were that (a) "[m]ultiple lines of independent evidence confirm that human activities are the primary cause of the global warming of the past 50 years," and (b) "[t]he burning of coal, oil, and gas, and clearing of forests have increased the concentration of carbon dioxide in the atmosphere by more than 40% since the Industrial Revolution . . . ."

24.     As a result, as the Third NCA further found, "U.S. average temperature has

increased by 1.3°F to 1.9°F since 1895," and "[t]emperatures are projected to rise another 2°F to

4°F in most areas of the United States over the next few decades."

25.     To address this crisis, the Third NCA explains that, "[o]ver the remainder of this

century, aggressive and sustained greenhouse gas emission reductions by the United States and

by other nations would be needed to reduce global emissions to a level consistent with" lessening

the most dire coming impacts from climate change.

**C.      The Advisory Committee For The Sustained National Climate Assessment**

26.     Shortly after the charter for the National Climate Assessment and Development

Advisory Committee expired in 2015, the Department of Commerce formed a successor advisory

committee, the Advisory Committee for the Sustain National Climate Assessment ("NCA

Advisory Committee"). The Committee was established to support the development of the NCA,

including the Fourth NCA due in 2018.

27.     As required by the Federal Advisory Committee Act, 5 U.S.C. App. 1, § 14(a)(2),

the initial term of the NCA Advisory Committee was for two years, but, as with the earlier

National Climate Assessment and Development Advisory Committee, its charter could easily

have been renewed. *Id.* at § 14(a)(2)(A); 41.C.F.R. § 102-3.55(4).

28.      In establishing the Committee the Department of Commerce recognized that the

Committee "will be needed on a continuing basis."

29.     According to its August 2015 charter, the NCA Advisory Committee's mission

was to "provide advice on sustained National Climate Assessment activities and products,"

including "the engagement of stakeholders and on sustained assessment activities and the

quadrennial National Climate Assessment report." In particular, the NCA Advisory Committee

was charged with providing "advice on a sustained National Climate Assessment process that" accomplishes several goals, including, *inter alia*, analyzing "the effects of current and projected climate change upon ecosystems and biological diversity"; addressing "current trends in global change"; "synthesiz[ing] relevant science and information about changes in the Earth system as they affect the Nation's climate"; and addressing "risk-based vulnerabilities for business and industry related to the impacts of weather and climate variations and changes."

30.     In addition to these more general charges, NOAA directed the NCA Committee to undertake more specific tasks to "develop a set of recommendations for a Sustained Assessment process by Spring 2018."  NOAA further directed that the NCA Committee provide interim recommendations by September 30, 2017.

31.     To carry out this mandate, the NCA Committee issued a Draft "Strategy for Preparing a Special Report: Recommendations on a Sustained National Climate Assessment," which outlined the four issues that would be addressed: (a) the core data to be relied on for the NCA; (b) structures for how that data will be utilized; (c) the stakeholder engagement process; and (d) NCA evaluation and adaptive management approaches. An outline of these issues was released for public comment, which was sought until August 14, 2017.

32.     On July 27, 2017, the NCA Committee held one of its public meetings. The Committee discussed its progress in working on these four issues, and other ongoing work.

**D.     NOAA's Termination of The NCA Committee**

33.     Despite the ongoing work of the NCA Committee, including one or more outstanding requests for specific work products, the Committee's charter was not renewed. On or about August 18, 2017, NOAA's acting administrator informed the Committee Chairman that the

Committee's Charter would not be renewed, and therefore the Committee summarily terminated on August 20, 2017.

34.     On information and belief, neither the Department of Commerce, NOAA, nor any other official has publicly explained why the NCA Committee was terminated, or how the NCA Committee's unfinished work will now be completed.

35.     Executive Branch officials have indicated that the federal government will no longer be spending resources on climate change related issues. For example, when asked about climate change spending, the Director of the Office of Management and Budget stated, "we're not spending money on that anymore," calling it "a waste of your money."  *See* Devin Henry, "White House: Climate funding is 'a waste of your money,'" The Hill, Mar. 16, 2017.

36.     On information and belief, federal agencies, including Defendants, are no longer engaged in the work necessary to complete the Fourth NCA by the statutory deadline in 2018.

**E.     The Center's FOIA Request**

37.     Seeking to understand why the NCA Committee was disbanded, on August 31, 2017 the Center sent Defendants a FOIA request (via electronic mail) seeking:

> All records mentioning, including, and/or referencing the decision to terminate, or otherwise not renew, the Federal Advisory Committee Act charter for the "Advisory Committee for the Sustained National Climate Assessment" (hereafter "Committee") including, but not limited to:
>
>> a.     Who participated in this decision-making process, both within and outside the agency and the U.S. Department of Commerce;
>>
>> b.     What factors were considered in making this decision; and
>>
>> c.     How the Committee's unfinished work will now be completed, including:
>>
>>> i. NOAA's formal request for the Committee to prepare, by the Spring of 2018, a set of "Recommendations on a Sustained National Climate Assessment," as detailed in Attachment A (Advisory Committee for the Sustained National 1 Climate Assessment); and

      ii. The Committee's other work in support of the preparation of the final Fourth National Climate Assessment, pursuant to 15 U.S.C. § 2936, in light of its charge "to advise on the engagement of stakeholders, and on sustained assessment activities and the quadrennial National Climate Assessment report" – particularly in light of the central role the Committee's predecessor advisory committee, the "National Climate Assessment & Development Advisory Committee," played in preparing the Third National Climate Assessment in 2014.

*See* Attachment.

38.     The Center's FOIA request also explained in detail the bases on which the Center is entitled to a waiver of any fees associated with the request. *Id.* at 4-8.

39.     Although more than 20-working days have passed since Defendants received the FOIA request, the Center has not received any acknowledgement of the FOIA request, any estimated completion date for a determination on the FOIA request, or any indication of when responsive records will be provided.

### FIRST CLAIM FOR RELIEF
### VIOLATION OF THE FREEDOM OF INFORMATION ACT

**(failure to make a timely determination on the Center's FOIA request)**

40.     Plaintiff re-alleges and incorporates by reference the allegations made in all preceding paragraphs.

41.     The Center has a statutory right to a lawful final determination from Defendants on its FOIA request, in a manner that complies with FOIA. Defendants have violated the Center's rights in this regard by unlawfully delaying their response beyond the deadline that FOIA mandates. 5 U.S.C. § 552(a)(6)(A)(i).

42.     The Center's organizational activities will be adversely affected if Defendants are allowed to continue violating FOIA's decision deadlines.

43.     Unless enjoined and made subject to a declaration of the Center's legal rights by this Court, Defendants will continue to violate the Center's rights to receive public records under FOIA.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF THE FREEDOM OF INFORMATION ACT

**(failure to provide the records responsive to the Center's FOIA request)**

44.     Plaintiff re-alleges and incorporates by reference the allegations made in all preceding paragraphs.

45.     Defendants are violating the FOIA and implementing regulations by refusing to disclose the records responsive to the Center's FOIA Request.

46.     The Center has a statutory right to the records it seeks.

47.     Based on the nature of the Center's organizational activities, it will undoubtedly continue to employ FOIA's provisions in record requests to Defendants in the foreseeable future.

48.     The Center's organizational activities will be adversely affected if Defendants continue to violate FOIA's disclosure provisions as it has in this case.

49.     Unless enjoined and made subject to a declaration of Plaintiff's legal rights by this Court, Defendants will continue to violate Plaintiff's rights to receive public records under FOIA.

## THIRD CLAIM FOR RELIEF
## VIOLATION OF THE FREEDOM OF INFORMATION ACT

**(failure to adequately search for records responsive to the Center's FOIA request)**

50.     Plaintiff re-alleges and incorporates by reference the allegations made in all preceding paragraphs.

51.     The Center has a statutory right to have Defendants process its FOIA requests in a manner that complies with FOIA.  5 U.S.C. § 552(a)(3).  Defendants are violating the Center's rights in this regard by unlawfully failing to undertake a search reasonably calculated to locate all records that are responsive to the Center's FOIA request.

52.     Based on the nature of the Center's organizational activities, it will undoubtedly continue to employ FOIA's provisions in record requests to Defendants in the foreseeable future.

53.     The Center's organizational activities will be adversely affected if Defendants continues to violate FOIA's requirement to undertake a search that is reasonably calculated to locate records that are responsive to the Center's FOIA requests.

54.     Unless enjoined and made subject to a declaration of the Center's legal rights by this Court, Defendants will continue to violate the Center's rights to receive public records under FOIA.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE FREEDOM OF INFORMATION ACT**

**(failure to disclose all non-exempt records responsive to the Center's FOIA Request)**

55.     Plaintiff re-alleges and incorporates by reference the allegations made in all preceding paragraphs.

56.     The Center has a statutory right to the records it seeks, and there is no legal basis for Defendants to assert that any of FOIA's nine exemptions to mandatory disclosure apply to withhold these records from the Center.  *See* 5 U.S.C. § 552(b)(1)-(9).

57.     To the extent Defendants are invoking any of these exemptions, Defendants are unlawfully withholding from disclosure records that are responsive to the Center's FOIA Request.

58.     Based on the nature of the Center's organizational activities, it will undoubtedly continue to employ FOIA's provisions in record requests to Defendants in the foreseeable future.

59.     The Center's organizational activities will be adversely affected if Defendants continues to violate FOIA's disclosure provisions.

60.     Unless enjoined and made subject to a declaration of the Center's legal rights by this Court, Defendants will continue to violate the Center's rights to receive public records under FOIA.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF THE FREEDOM OF INFORMATION ACT**

**(failure to provide reasonably segregable portions of any lawfully exempt records)**

61.     Plaintiff re-alleges and incorporates by reference the allegations made in all preceding paragraphs.

62.     The Center has a statutory right to any reasonably segregable portion of a record that may contains information lawfully subject to any of FOIA's exemptions.  5 U.S.C. § 552(b).

63.     Defendants are violating the Center's rights in this regard to the extent they are unlawfully withholding reasonably segregable portions of any lawfully exempt records that are responsive to the Center's FOIA Request.

64.     Based on the nature of the Center's organizational activities, it will undoubtedly continue to employ FOIA's provisions in record requests to Defendants in the foreseeable future.

65.     The Center's organizational activities will be adversely affected if Defendants are allowed to continue violating FOIA's disclosure provisions as it has in this case.

66.     Unless enjoined and made subject to a declaration of the Center's legal rights by this Court, Defendants will continue to violate the Center's rights to receive public records under FOIA.

## SIXTH CLAIM FOR RELIEF
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### (In the Alternative to the First Through Fifth Claim)

### (agency action unlawfully withheld or unreasonably delayed)

67.    Plaintiff re-alleges and incorporates by reference the allegations made in all preceding paragraphs.

68.    Defendants are unlawfully withholding agency action by failing to comply with the mandates of FOIA as a result of its failure and refusal to search for and disclose records responsive to the Center's FOIA Request. Defendants failures constitute agency actions that are unlawfully withheld pursuant to the APA, 5 U.S.C. § 706(1).

69.    Alternatively, Defendants are unreasonably delaying agency action by failing to comply with the mandates of FOIA as a result of its failure and refusal to search for and disclose records responsive to the Center's FOIA request. Defendants' failures constitute agency action unreasonably delayed pursuant to the APA, 5 U.S.C. § 706(1).

70.    As alleged above, Defendants' failure to comply with the mandates of FOIA has injured the Center's interests in public oversight of governmental operations and is in violation of its statutory duties under the APA.

71.    The Center has suffered a legal wrong as a result of Defendants' failure to comply with the mandates of FOIA.  As alleged above, Defendants are violating their statutory duties under the APA and injuring the Center's interests in public oversight of governmental operations.

72.    The Center has no other adequate remedy at law to redress the violations noted above.

73.    Plaintiff is entitled to judicial review under the APA, 5 U.S.C. § 702.

## SEVENTH CLAIM FOR RELIEF
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### (In the Alternative to the First Through Sixth Claims)

### (arbitrary and capricious agency action)

74.     Plaintiff re-alleges and incorporates by reference the allegations made in all preceding paragraphs.

75.     Defendants are violating FOIA's statutory mandates by failing to search for and disclose records responsive to the Center's FOIA request. By violating FOIA's statutory mandates, Defendants' actions are arbitrary, capricious, an abuse of discretion, or not in accordance with the law pursuant to the APA, 5 U.S.C. § 706(2)(A).

76.     As alleged above, Defendants' failure to comply with the mandates of FOIA has injured the Center's interests in public oversight of governmental operations and is in violation of the agency's statutory duties under the APA.

77.     The Center has suffered a legal wrong as a result of Defendants' failure to comply with the mandates of FOIA.  As alleged above, Defendants are violating their statutory duties under the APA and injuring the Center's interests in public oversight of governmental operations.

78.     The Center has no other adequate remedy at law to redress the violations noted above.

79.     The Center is entitled to judicial review under the APA, 5 U.S.C. § 702.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

1.      Order Defendants to conduct searches reasonably calculated to locate all records responsive to the Center's FOIA request, utilizing a cut-off date for such searches that is the date the searches are conducted, and providing the Center, by a date certain, with all responsive records and reasonably segregable portions of lawfully exempt records sought in this action.

2.      Declare that Defendants' failures to timely undertake a search for and disclose to Plaintiff all records responsive to Plaintiff's FOIA Request, as alleged above, are unlawful under FOIA, U.S.C. § 552(a)(6)(A)(i), or in the alternative, are agency action that has been unlawfully withheld or unreasonably delayed, 5 U.S.C. § 706(1), or are arbitrary, capricious, an abuse of discretion, or not in accordance with law, 5 U.S.C. § 706(2).

3.      Declare that Defendants' failure to timely make a determination on Plaintiff's FOIA Request is unlawful under FOIA, 5 U.S.C. § 552(a)(6)(A)(i) and (ii), or in the alternative, is agency action that has been unlawfully withheld or unreasonably delayed, 5 U.S.C. § 706(1), or is arbitrary, capricious, an abuse of discretion, or not in accordance with law, 5 U.S.C. § 706(2)(A).

4.      Award Plaintiff its costs and reasonable attorney fees pursuant to 5 U.S.C. § 552(a)(4)(E) or 28 U.S.C. § 2412.

5.     Grant such other and further relief as the Court may deem just and proper.

DATED: October 3, 2017                     Respectfully submitted,


                                           */s/ Howard M. Crystal*
                                           Howard M. Crystal
                                           (D.C. Bar. No. 446189)
                                           CENTER FOR BIOLOGICAL DIVERSITY
                                           1411 K Street N.W., Suite 1300
                                           Washington, DC 20005
                                           Telephone:     202-809-6926
                                           Email:         hcrystal@biologicaldiversity.org

                                           *Attorney for Plaintiff*

ATTACHMENT

CENTER for BIOLOGICAL DIVERSITY                    Because life is good.

August 31, 2017

*VIA ELECTRONIC MAIL*

FOIA Officer
National Oceanic and Atmospheric Administration
Public Reference Facility (SOU1000)
1315 East-West Highway, Room 9719 (SSMC3)
Silver Spring, MD 20910
FOIA@noaa.gov

Re:     Freedom of Information Act Request: National Climate Assessment and Disbanded
        Advisory Committee

Dear FOIA Officer:

This is a request under the Freedom of Information Act, 5 U.S.C. § 552, *as amended* ("FOIA"),
from the Center for Biological Diversity ("Center"), a non-profit organization that works to
secure a future for all species hovering on the brink of extinction through science, law, and
creative media, and to fulfill the continuing educational goals of its membership and the general
public in the process.

## REQUESTED RECORDS

The Center requests the following records from the National Oceanic Atmospheric
Administration ("NOAA"):

1.  All records mentioning, including, and/or referencing the decision to terminate, or
    otherwise not renew, the Federal Advisory Committee Act charter for the "Advisory
    Committee for the Sustained National Climate Assessment" (hereafter "Committee")
    including, but not limited to:

    a.  Who participated in this decision-making process, both within and outside the
        agency and the U.S. Department of Commerce;

    b.  What factors were considered in making this decision; and

    c.  How the Committee's unfinished work will now be completed, including:

    i.   NOAA's formal request for the Committee to prepare, by the Spring of 2018, a set of "Recommendations on a Sustained National Climate Assessment," as detailed in <u>Attachment A (Advisory Committee for the Sustained National 1 Climate Assessment)</u>; and

    ii.   The Committee's other work in support of the preparation of the final Fourth National Climate Assessment, pursuant to 15 U.S.C. § 2936, in light of its charge "to advise on the engagement of stakeholders, and on sustained assessment activities and the quadrennial National Climate Assessment report" – particularly in light of the central role the Committee's predecessor advisory committee, the "National Climate Assessment & Development Advisory Committee," played in preparing the Third National Climate Assessment in 2014.

For this request, the term "all records" refers to, but is not limited to, any and all documents, correspondence (including, but not limited to, inter and/or intra-agency correspondence as well as correspondence with entities or individuals outside the federal government), emails, letters, notes, recordings, telephone records, voicemails, telephone notes, telephone logs, text messages, chat messages, minutes, memoranda, comments, files, presentations, consultations, biological opinions, assessments, evaluations, schedules, papers published and/or unpublished, reports, studies, photographs and other images, data (including raw data, GPS or GIS data, UTM, LiDAR, etc.), maps, and/or all other responsive records, in draft or final form.

This request is not meant to exclude any other records that, although not specially requested, are reasonably related to the subject matter of this request.  If you or your office have destroyed or determine to withhold any records that could be reasonably construed to be responsive to this request, I ask that you indicate this fact and the reasons therefore in your response.

Under the FOIA Improvement Act of 2016, agencies are prohibited from denying requests for information under FOIA unless the agency reasonably believes release of the information will harm an interest that is protected by the exemption.  FOIA Improvement Act of 2016 (Public Law No. 114-185), codified at 5 U.S.C. § 552(a)(8)(A).

Should you decide to invoke a FOIA exemption, please include sufficient information for us to assess the basis for the exemption, including any interest(s) that would be harmed by release. Please include a detailed ledger which includes:

    1.   Basic factual material about each withheld record, including the originator, date, length, general subject matter, and location of each item; and

    2.   Complete explanations and justifications for the withholding, including the specific exemption(s) under which the record (or portion thereof) was withheld and a full explanation of how each exemption applies to the withheld material. Such statements will be helpful in deciding whether to appeal an adverse determination.  Your written justification may help to avoid litigation.

If you determine that portions of the records requested are exempt from disclosure, we request that you segregate the exempt portions and mail the non-exempt portions of such records to my attention at the address below within the statutory time limit.  5 U.S.C. § 552(b).

The Center is willing to receive records on a rolling basis.

Finally, FOIA's "frequently requested record" provision was enacted as part of the 1996 Electronic Freedom of Information Act Amendments, and requires all federal agencies to give "reading room" treatment to any FOIA-processed records that, "because of the nature of their subject matter, the agency determines have become the subject of subsequent requests for substantially the same records."  *See* 5 U.S.C. § 552(a)(2)(D)(ii)(I).  Also, enacted as part of the 2016 FOIA Improvement Act, FOIA's Rule of 3 requires all federal agencies to proactively "make available for public inspection in an electronic format" "copies of records, regardless of form or format … that have been released to any person … and … that have been requested 3 or more times."  5 U.S.C. § 552(a)(2)(D)(ii)(II).  Therefore, we respectfully request that you make available online any records that the agency determines will become the subject of subsequent requests for substantially the same records, and records that have been requested three or more times.

## FORMAT OF REQUESTED RECORDS

Under FOIA, you are obligated to provide records in a readily accessible electronic format and in the format requested.  *See, e.g.*, 5 U.S.C. § 552(a)(3)(B) ("In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format.").  "Readily accessible" means text-searchable and OCR-formatted.  *See* 5 U.S.C. § 552(a)(3)(B).  We ask that you please provide all records in an electronic format.  Additionally, please provide the records either in (1) load-ready format with a CSV file index or Excel spreadsheet, or; (2) for files that are in .PDF format, without any "portfolios" or "embedded files."  Portfolios and embedded files within files are not readily accessible.  *Please do not provide the records in a single, or "batched," .PDF file.*  We appreciate the inclusion of an index.

## RECORD DELIVERY

We appreciate your help in expeditiously obtaining a determination on the requested records.  As mandated in FOIA, we anticipate a reply within 20 working days.  5 U.S.C. § 552(a)(6)(A)(i).  Failure to comply within the statutory timeframe may result in the Center taking additional steps to ensure timely receipt of the requested materials.  Please provide a complete reply as expeditiously as possible.  You may email or mail copies of the requested records to:

Margaret E. Townsend
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
mtownsend@biologicaldiversity.org

If you find that this request is unclear, or if the responsive records are voluminous, please call me at (971) 717-6409 to discuss the scope of this request.

REQUEST FOR FEE WAIVER

FOIA was designed to provide citizens a broad right to access government records. FOIA's basic purpose is to "open agency action to the light of public scrutiny," with a focus on the public's "right to be informed about what their government is up to." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773-74 (1989) (internal quotation and citations omitted). In order to provide public access to this information, FOIA's fee waiver provision requires that "[d]ocuments shall be furnished without any charge or at a [reduced] charge," if the request satisfies the standard. 5 U.S.C. § 552(a)(4)(A)(iii). FOIA's fee waiver requirement is "liberally construed." *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir. 2003); *Forest Guardians v. U.S. Dept. of Interior*, 416 F.3d 1173, 1178 (10th Cir. 2005).

The 1986 fee waiver amendments were designed specifically to provide non-profit organizations such as the Center access to government records without the payment of fees. Indeed, FOIA's fee waiver provision was intended "to prevent government agencies from using high fees to discourage certain types of requesters and requests," which are "consistently associated with requests from journalists, scholars, and *non-profit public interest groups*." *Ettlinger v. FBI*, 596 F.Supp. 867, 872 (D. Mass. 1984) (emphasis added). As one Senator stated, "[a]gencies should not be allowed to use fees as an offensive weapon against requesters seeking access to Government information ... ." 132 Cong. Rec. S. 14298 (statement of Senator Leahy).

I.     The Center Qualifies for a Fee Waiver.

Under FOIA, a party is entitled to a fee waiver when "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the [Federal] government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). The Department of Commerce FOIA regulations that govern NOAA at 15 C.F.R. § 4.11(l) establish the same standard.

Thus, NOAA must consider four factors to determine whether a request is in the public interest: (1) whether the subject of the requested records concerns "the operations or activities of the Federal government," (2) whether the disclosure is "likely to contribute" to an understanding of government operations or activities, (3) whether the disclosure "will contribute to public understanding" of a reasonably broad audience of persons interested in the subject, and (4) whether the disclosure is likely to contribute "significantly" to public understanding of government operations or activities. 15 C.F.R. § 4.11(l)(2)(i) – (iv). As shown below, the Center meets each of these factors.

A.     The Subject of This Request Concerns "The Operations and Activities of the Government."

The subject matter of this request concerns the operations and activities of NOAA. This request asks for: (1) all records mentioning, including, and/or referencing the decision to terminate, or

4

otherwise not renew, the Federal Advisory Committee Act charter for the Committee  including, but not limited to: (a) who participated in this decision-making process, both within and outside the agency and the U.S. Department of Commerce; (b) what factors were considered in making this decision; and (c) how the Committee's unfinished work will now be completed, including: (i) NOAA's formal request for the Committee to prepare, by the Spring of 2018, a set of "Recommendations on a Sustained National Climate Assessment," as detailed in Attachment A; and (ii) the Committee's other work in support of the preparation of the final Fourth National Climate Assessment, pursuant to 15 U.S.C. § 2936, in light of  its charge "to advise on the engagement of stakeholders, and on sustained assessment activities and the quadrennial National Climate Assessment report" – particularly in light of the central role the Committee's predecessor advisory committee, the "National Climate Assessment & Development Advisory Committee," played in preparing the Third National Climate Assessment in 2014.

This FOIA will provide the Center and the public with crucial insight into why NOAA and/or other government officials decided to terminate this Advisory Committee despite its ongoing work.  It is clear that  disbanding a federal advisory committee is a specific and identifiable activity of the government, in this case the executive branch agency, NOAA.  *Judicial Watch*, 326 F.3d at 1313 ("[R]easonable specificity is all that FOIA requires with regard to this factor") (internal quotations omitted).  Thus, the Center meets this factor.

   B.  Disclosure is "Likely to Contribute" to an Understanding of Government Operations
       or Activities.

The requested records are meaningfully informative about government operations or activities and will contribute to an increased understanding of those operations and activities by the public.

Disclosure of the requested records will allow the Center to convey to the public information about how NOAA and/or other government agencies arrived at the decision to cease the Committee.  Given the statutory mandate to prepare a new Climate Assessment, the public has a strong interest in finding out why this Committee was terminated, and how NOAA is going to continue to support its Climate Assessment work without the Committee.   Once the information is made available, the Center will analyze it and present it to its 1.3 million members and online activists and the general public in a manner that will meaningfully enhance the public's understanding of this topic.

Thus, the requested records are likely to contribute to an understanding of NOAA operations and activities.

   C.  Disclosure of the Requested Records Will Contribute to a Reasonably Broad
       Audience of Interested Persons' Understanding of National Climate Assessment and
       Disbanded Advisory Committee

The requested records will contribute to public understanding of NOAA's decision to disband the Committee is consistent with its mission to "to understand and predict changes in climate, weather, oceans and coasts; to share that knowledge and information with others; to conserve and manage coastal and marine ecosystems and resources; and to understand and predict changes

in climate, weather, oceans and coasts."[1]  As explained above, the records will contribute to public understanding of this topic.

Activities of NOAA generally, and specifically its decision to disband the Committee concerning climate assessment are areas of interest to a reasonably broad segment of the public.  The Center will use the information it obtains from the disclosed records to educate the public at large about why the Committee was terminated and how the climate assessment work will proceed.  *See W. Watersheds Proj. v. Brown*, 318 F.Supp.2d 1036, 1040 (D. Idaho 2004) ("... find[ing] that WWP adequately specified the public interest to be served, that is, educating the public about the ecological conditions of the land managed by the BLM and also how … management strategies employed by the BLM may adversely affect the environment.").

Through the Center's synthesis and dissemination (by means discussed in Section II, below), disclosure of information contained in and gleaned from the requested records will contribute to a broad audience of persons who are interested in the subject matter.  *Ettlinger v. FBI*, 596 F.Supp. at 876 (benefit to a population group of some size distinct from the requester alone is sufficient); *Carney v. Dep't of Justice*, 19 F.3d 807, 815 (2d Cir. 1994), *cert. denied*, 513 U.S. 823 (1994) (applying "public" to require a sufficient "breadth of benefit" beyond the requester's own interests); *Cmty. Legal Servs. v. Dep't of Hous. & Urban Dev.*, 405 F.Supp.2d 553, 557 (E.D. Pa. 2005) (in granting fee waiver to community legal group, court noted that while the requester's "work by its nature is unlikely to reach a very general audience," "there is a segment of the public that is interested in its work").

Indeed, the public does not currently have an ability to easily evaluate the requested records, which concern the Committee's termination that are not currently in the public domain.  *See Cmty. Legal Servs. v. HUD*, 405 F.Supp.2d 553, 560 (D. Pa. 2005) (because requested records "clarify important facts" about agency policy, "the CLS request would likely shed light on information that is new to the interested public.").  As the Ninth Circuit observed in *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1286 (9th Cir. 1987), "[FOIA] legislative history suggests that information [has more potential to contribute to public understanding] to the degree that the information is new and supports public oversight of agency operations… ."[2]

Disclosure of these records is not only "likely to contribute," but is certain to contribute, to public understanding of NOAA's decision to disband the Committee, and how the agency's climate assessment work will continue given the statutory deadline to complete a new Climate Assessment.  The public is always well served when it knows how the government conducts its activities, particularly matters touching on legal questions.  Hence, there can be no dispute that

---

[1] National Oceanic Atmospheric Administration, *Our Mission and Vision: Science, Service and Stewardship*, http://www.noaa.gov/our-mission-and-vision (last visited Aug. 28, 2017).

[2] In this connection, it is immaterial whether any portion of the Center's request may currently be in the public domain because the Center requests considerably more than any piece of information that may currently be available to other individuals.  *See Judicial Watch*, 326 F.3d at 1315.

disclosure of the requested records to the public will educate the public about the decision making process regarding terminating the Committee.

   D. Disclosure is Likely to Contribute Significantly to Public Understanding of Government Operations or Activities.

The Center is not requesting these records merely for their intrinsic informational value. Disclosure of the requested records will significantly enhance the public's understanding of the dissolution of the Committee on climate assessment as compared to the level of public understanding that exists prior to the disclosure.  Indeed, public understanding will be *significantly* increased as a result of disclosure because the requested records will help reveal more about the decision to terminate the committee, and how NOAA will fulfill its statutory mandates regarding the next Climate Assessment

The records are also certain to shed light on NOAA's compliance with its own mission.[3]  Such public oversight of agency action is vital to our democratic system and clearly envisioned by the drafters of the FOIA.  Thus, the Center meets this factor as well.

II.   The Center has a Demonstrated Ability to Disseminate the Requested Information Broadly.

The Center is a non-profit organization that informs, educates, and counsels the public regarding environmental issues, policies, and laws relating to environmental issues.  The Center has been substantially involved in the activities of numerous government agencies for over 25 years, and has consistently displayed its ability to disseminate information granted to it through FOIA.

In consistently granting the Center's fee waivers, agencies have recognized: (1) that the information requested by the Center contributes significantly to the public's understanding of the government's operations or activities; (2) that the information enhances the public's understanding to a greater degree than currently exists; (3) that the Center possesses the expertise to explain the requested information to the public; (4) that the Center possesses the ability to disseminate the requested information to the general public; (5) and that the news media recognizes the Center as an established expert in the field of imperiled species, biodiversity, and impacts on protected species.  The Center's track record of active participation in oversight of governmental activities and decision making, and its consistent contribution to the public's understanding of those activities as compared to the level of public understanding prior to disclosure are well established.

The Center intends to use the records requested here similarly.  The Center's work appears in more than 2,500 news stories online and in print, radio and TV per month, including regular reporting in such important outlets as *The New York Times*, *Washington Post*, *The Guardian*, and *Los Angeles Times*.  Many media outlets have reported on the Trump administration's priorities concerning climate science, utilizing information obtained by the Center from federal agencies including NOAA.  In 2016, more than 2 million people visited the Center's extensive website,

---

[3] *See supra* note at 1.

viewing a total of more than 5.2 million pages.  The Center sends out more than 277 email newsletters and action alerts per year to more than 1.3 million members and supporters.  Three times a year, the Center sends printed newsletters to more than 58,016 members.  More than 233,000 people have "liked" the Center on Facebook, and there are regular postings regarding environmental health and climate change.  The Center also regularly tweets to more than 52,200 followers on Twitter.  The Center intends to use any or all of these far-reaching media outlets to share with the public information obtained as a result of this request.

Public oversight and enhanced understanding of NOAA's duties is absolutely necessary.  In determining whether disclosure of requested information will contribute significantly to public understanding, a guiding test is whether the requester will disseminate the information to a reasonably-broad audience of persons interested in the subject.  *Carney v U.S. Dept. of Justice*, 19 F.3d 807 (2nd Cir. 1994).  The Center need not show how it intends to distribute the information, because "[n]othing in FOIA, the [agency] regulation, or our case law require[s] such pointless specificity."  *Judicial Watch*, 326 F.3d at 1314.  It is sufficient for the Center to show how it distributes information to the public generally.  *Id.*

III.    Obtaining the Requested Records is of No Commercial Interest to the Center.

Access to government records, disclosure forms, and similar materials through FOIA requests is essential to the Center's role of educating the general public.  Founded in 1994, the Center is a 501(c)(3) nonprofit conservation organization (EIN: 27-3943866) with more than 1.3 million members and online activists dedicated to the protection of endangered and threatened species and wild places.  The Center has no commercial interest and will realize no commercial benefit from the release of the requested records.

IV.    Conclusion

For all of the foregoing reasons, the Center qualifies for a full fee waiver.  We hope that NOAA will immediately grant this fee waiver request and begin to search and disclose the requested records without any unnecessary delays.

If you have any questions, please contact me at (971) 717-6409 or foia@biologicaldiversity.org.  All records and any related correspondence should be sent to my attention at the address below.

Sincerely,

Margaret E. Townsend
Open Government Staff Attorney
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211-0374
foia@biologicaldiversity.org

Attachment:

    Attachment A (Advisory Committee for the Sustained National 1 Climate Assessment)

**Attachment A**

Advisory Committee for the Sustained National Climate Assessment

Strategy for Preparing a Special Report:
Recommendations on a Sustained National Climate Assessment

**Purpose of this Document**: The National Oceanic and Atmospheric Administration (NOAA), on behalf of the Subcommittee on Global Change Research (SGCR), submitted the following request to the Advisory Committee:

> "In order for the USG to implement a vision for Sustained Assessment in time for the 5th (and future) National Climate Assessment, NOAA requests, on behalf of the USGCRP and its member agencies, that the Advisory Committee for the Sustained National Climate Assessment develop a set of recommendations for a Sustained Assessment process by Spring 2018. We also request a progress or interim report by September 30, 2017. The recommendations should be feasible, realistic in terms of budget implications, and grounded in the Congressional mandate for a quadrennial assessment."

This document spells out the strategy the Advisory Committee will adopt to fulfill this request in a timely fashion. The document describes (1) four topics the Advisory Committee will address and (2) the main elements of the process it will follow. This strategy was developed with input from SGCR members, program managers of the USGCRP, staff of the National Assessment Coordination Office, and members of the Advisory Committee. The Advisory Committee may revise the list of topics and process based on new information it collects.

**Context of Prior Recommendations, Subsequent Experience, and Changing Societal Needs**: In 2013, the predecessor to this Advisory Committee, the National Climate Assessment Development and Advisory Committee (NCADAC), released a report that identified four "critical elements" of a sustained national climate assessment (SNCA) process (https://tinyurl.com/lfd5fdd). Since the release of the report, the USGCRP has completed the Third National Climate Assessment (NCA3), several special reports, and other products. The program and member agencies continue to engage with users of climate and global change information. And they have developed new activities and programs that are relevant to the SNCA. Beyond the activities of the USG, others such as states, cities, private sector firms, and non-governmental organizations (NGOs) have initiated their own activities and prepared SNCA-relevant products. The National Academy of Sciences and other advisory bodies have prepared subsequent recommendations, and the research literature on sustained assessment has expanded. The Advisory Committee will build on the 2013 NCADAC report and consider these subsequent developments as it prepares its recommendations.

**Topics to be Addressed**: The recommendations will address four topics identified through interactions with USGCRP and input from Advisory Committee members. These topics are overlapping, and the Advisory Committee will need include recommendations for coordinating related objectives or issues.

45   *Topic 1: Core Products and Activities of the Sustained Assessment Process*
46         The Advisory Committee will develop recommendations on a "core set" of NCA products
47   and activities to serve as the foundation for the SNCA. Example products could include
48   time-stamped observational data sets, projections of future conditions, indicators,
49   periodic "state of science of US climate conditions", quadrennial reports, and technical
50   guidelines. Example activities or programs could include regional science organizations,
51   networks of sustained assessment participants, and an advisory committee of users and
52   producers of SNCA products. The Advisory Committee envisions developing
53   recommendations to address several specific topics or issues, for example:
54         • Alternative criteria for determining what is "core";
55         • Efficient use of core products in producing quadrennial reports and other
56           mandated products;
57         • Responsibilities of USGCRP and other actors for products that are "core" for
58           different users (e.g., for analysis of vulnerabilities and adaptation strategies at
59           state/municipal levels);
60         • The hand-off from the core set of products and activities to derived products for
61           specific objectives such as evaluation of risks or identification of solutions.
62
63   *Topic 2: Products Derived from the Core Set of SNCA Resources*
64         For this topic, the Advisory Committee will develop recommendations on how to foster
65   a "virtuous cycle" that facilitates use of the core set of SNCA resources by stakeholders
66   to develop products to meet their needs, and a feedback of information into the process
67   that helps to evaluate existing products and contribute knowledge to new ones. The
68   Climate Resilience Toolkit (CRT—https://toolkit.climate.gov/content/home) includes
69   examples of such products that provide maps, scenarios, guidelines, and other
70   information at local to regional scales. Specific issues likely to be addressed include:
71         • Developing a clear structure for how core NCA products (CRT, Global Change
72           Information System, etc.) interact and feedback into future NCA activities;
73         • Developing clear mechanisms of engagement for non-federal participants
74           (Partnership, program, and infrastructure models);
75         • Engagement of professional associations (e.g., American Society of Civil
76           Engineers) and others to develop recommendations for evaluation processes for
77           current and future products.
78
79   *Topic 3: Modes of Engagement with the NCA Process*
80         Many constituent partnerships, including end users and capacity-building boundary
81   entities, have been formed during the NCA process. To promote engagement and
82   dialogue, the USGCRP sustains the NCANet, a network of some 200 entities that
83   participate in the assessment process. Maintaining and strengthening existing
84   partnerships, and developing new forms of engagement, is challenging for the USGCRP,
85   Agencies, and programs in the context of the legal constraints and capacity limitations.
86   In developing recommendations on this topic, the Advisory Committee will consider

87      what has been learned since the NCADAC 2013 report about engagement in the NCA
88      process. Recommendations may be provided for several specific topics:
89          • Characterize modes of and mechanisms for existing engagement of end users
90            and boundary entities (including private sector climate service providers);
91          • Identify agency-specific and external engagement processes and processes that
92            may be modified for the NCA context to strengthen existing partnerships;
93          • Strategize how climate assessment gaps can be addressed through establishing
94            and supporting new engagement partnerships;
95          • Outline recommendations for an engagement infrastructure that both ensures
96            bottom-up partnerships for assessment with end users and boundary entities
97            and for tailoring scientific assessment for decision relevance and knowledge co-
98            production;
99          • Enable successful evaluation of partnership support and progress during the
100           sustained assessment process.
101
102    *Topic 4: Fostering Evaluation of the Sustained Assessment Process and Use of NCA Products in*
103    *Decision Making*
104      Following the release of NCA3, USGCRP convened a workshop that developed
105      recommendations for evaluation of NCA3 outcomes (https://tinyurl.com/zw82eqn), and
106      an appraisal of the process was completed (https://tinyurl.com/lgkxa5n;
107      https://tinyurl.com/lt7zsss). Additional evaluation is needed to support ongoing
108      improvement of the SNCA process and provision of decision-support products. The
109      Advisory Committee will develop recommendations for expanding opportunities to
110      foster evaluation and improve adaptive management of the assessment.
111      Recommendations will address specific topics such as:
112          • Incentivize agencies to collect data that would be available and accessible for
113            evaluation researchers and practitioners (longitudinal and cross-sectional data);
114          • Design of evaluation protocols and approaches that assess different kinds of
115            impacts (outputs, outcomes, gap analysis, societal impacts);
116          • Design of approaches that contribute to/encourage sustained relationships (co-
117            production, participatory evaluations, focus groups);
118          • Better understanding of needs of agencies, stakeholders, and users.
119
120    **Elements of Process**:
121      The Advisory Committee will prepare its recommendations through a transparent
122      process that meets the requirements of the Federal Advisory Committee Act. It will
123      solicit public input, consult subject matter experts, review prior recommendations,
124      provide interim findings (in summary form), request feedback from the SGCR, issue a
125      draft report for public comment, and publish a final report with recommendations.